**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TONYA Y. TILLER,** | : | |
| **Plaintiff,** | : | **Case No. 2:05-cv-1034-JDH-NMK** |
| **v.** | : | **Judge Holschuh** |
| **IMMKE AUTOMOTIVE GROUP, INC. and IMMKE NORTHWEST, INC.,** | : | **Magistrate Judge King** |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, Tonya Y. Tiller, brings this action for unlawful discrimination against Defendants Immke Automotive Group, Inc. ("IAG") and Immke Northwest, Inc. ("Immke Northwest"). Plaintiff alleges that Defendants discriminated against her on the basis of her race and her sex in the terms and conditions of her employment. Plaintiff asserts claims brought pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e et seq., Ohio Revised Code chapter 4112, and the common law of Ohio. This Court has jurisdiction over Plaintiff's § 1981 and Title VII claims pursuant to 28 U.S.C. § 1331 as they are claims arising under the Constitution, laws, or treaties of the United States. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. This matter is before the Court on Defendants' Motion for Summary Judgment on all claims. (R. at 15.)

**I.     Background**

Immke Honda is an automobile dealership in Dublin, Ohio owned and operated by Defendant Immke Northwest. (Magill Aff. ¶ 5, June 26, 2006.) Immke Northwest hired Plaintiff in May 2001 to work as a sales representative at Immke Honda. (Id. ¶ 4.) Plaintiff was hired by Michael

Thompson, the general manager of the dealership, and she was supervised by both Thompson and Senior Sales Manager Tim McAndrew.  (Pl.'s Aff. ¶ 5.) As a sales representative, Plaintiff was responsible for selling vehicles and providing customer service.  (Id. ¶ 2.)

Plaintiff's compensation was based on commissions and bonuses that she earned for selling vehicles.  (Id. ¶ 3.)  Commissions and bonuses earned by Immke Honda sales representatives in a given month are calculated after the month ends and are paid at the beginning of the next month. (Lorton Aff. ¶ 13, June 26, 2006.)  Each month, sales representatives receive a $1500 advance on their commissions; this advance is called a draw.  (Id. ¶¶ 11-12.)  When the sales representatives are paid for their monthly commissions and bonuses, the draw from the prior month is first subtracted. (Id. ¶ 16.)  If a sales representative's commissions and bonuses are less than the draw, then the sales representative has failed to "cover the draw."  (Id. ¶ 17.)  If this occurs, no commissions or bonuses are paid to the sales representative, and the amount by which the draw exceeds the sum of commissions and bonuses carries over to the next month as a debit on the next month's commissions and bonuses.  (Id.)  During 2002 and 2003, Plaintiff earned annual commissions greater than the average sales representative at Immke Honda.  (Pl.'s Aff. ¶ 4.)  Between the date of her hire and June 2004, Plaintiff was generally praised for her work.  (Id. ¶ 5.)

In January 2004, Immke Northwest came under new ownership.  (Magill Aff. ¶ 7, June 26, 2006.)  In an effort to improve the profitability of the corporation, the management of the sales department at Immke Honda was replaced in June 2004.  (Id. ¶¶ 8-9.)  Thompson was discharged, and Todd Eggleston assumed many of Thompson's duties in the newly-created position of General Sales Manager.  (Id. ¶¶ 10-11.)  Michael Lorton was assigned the position of Senior Sales Manager,

replacing Tim McAndrew on June 1, 2004.  (Id. ¶ 11; Lorton Aff. ¶ 2, June 26, 2006; Pl.'s Aff. ¶ 6.)

Lorton states that when he assumed the Senior Sales Manager position, he desired to assess the competence and quality of the dealership's sales representative staff.  (Lorton Aff. ¶ 3, June 26, 2006.)  Lorton determined that the sales representatives, as a whole, were not earning sufficiently high commissions and several sales representatives were underachieving.  (Id. ¶ 4.)  Lorton did not review any of the sales representatives' personnel files or their historical sales performance in coming to this conclusion; instead, he based his assessment of the staff on conversations that he had with the previous sales manager[1] and his interactions with sales representatives on the showroom floor.  (Lorton Dep. 27:1-29:15.)

To improve the sales representatives' performance, Lorton established a new commission structure for their compensation that became effective July 1, 2004.  (Lorton Aff. ¶ 5-6, 9, June 26, 2006.)  The new commission structure increased from eight to twelve the number of vehicles that a sales representative had to sell in a month to receive a bonus on units sold for that month.  (Id. ¶ 8.)  It also provided additional bonuses for reaching certain increments above the initial target of twelve vehicles.[2]  (Id.)  Lorton decided to assess the sales representatives' performance under the new commission structure after the first three months of its implementation.  (Id. ¶ 10.)

---

[1] It is unclear from the record with which previous sales manager Lorton spoke.

[2] By selling twelve vehicles in a month, a sales representative would earn a bonus on units of $250.  The bonus for fifteen vehicles was $500.  For eighteen vehicles, the bonus was $750.  At twenty-one vehicles, the bonus was $1250, and for every vehicle over twenty-one, a sales representative would earn a bonus of $100.  (Immke Auto Group Pay Plan Schedule, Defs.' Reply Mem. Ex. D.)

3

Plaintiff's sales performance during July, August, and September 2004 did not meet the goals set forth in the new commission structure. During July, Plaintiff sold ten vehicles. (Pl.'s Aff. ¶ 16.) In August, her number of sales dropped to eight. (Id.) During July and August 2004, Plaintiff was one of two sales representatives that had insufficient sales to cover the draw for those months. (Lorton Aff. ¶¶ 19, 21, June 26, 2006.) In September, Plaintiff sold nine vehicles. (Pl.'s Aff. ¶ 16.) Lorton recommended to Eggleston that Plaintiff be terminated because of her poor sales performance in July, August, and September 2004.[3] (Lorton Aff. ¶ 27, Oct. 23, 2006.) Eggleston endorsed Lorton's decision.[4] (Id.; Eggleston Dep. 27:16-20.) On October 1, 2004, Lorton informed Plaintiff that her employment with Immke Northwest was terminated. (Lorton Aff. ¶ 27, Oct. 23, 2006; Eggleston Dep. 33:10-22; see Pl.'s Aff. ¶ 15.) Eggleston was present for this meeting. (Eggleston Dep. 33:13-22.)

On September 29, 2004, two days before she was terminated, Plaintiff filed a charge of race and sex discrimination with the Ohio Civil Rights Commission.[5] (Pl.'s Aff. ¶ 14.) Plaintiff filed the

---

[3] In evaluating her September sales performance, Lorton only examined Plaintiff's unit sales because information regarding sales representatives' commissions for the month of September was not yet available. (Lorton Aff. ¶ 24, Oct. 23, 2006.)

[4] Although Lorton had authority to hire and fire sales representatives, ultimate authority rested with Eggleston, the senior manager. (Magill Aff. ¶ 12, June 26, 2006.)

[5] In her Amended Complaint, Plaintiff alleges that her complaining about being discriminated against was one of the determining factors in her employment discharge. (Am. Compl. ¶ 16.) Although, liberally construed, Plaintiff's Amended Complaint could put Defendants on notice of claims of unlawful retaliation under both Title VII and Ohio Revised Code chapter 4112, Plaintiff has only pursued such a claim pursuant to the Ohio statute. In her Memorandum Contra, Plaintiff argues that Defendants violated Ohio Revised Code § 4112.02(I) by retaliating against her for engaging in activity protected under chapter 4112. (Pl.'s Mem. Contra 13-15.) To the extent that she alleges a claim of unlawful retaliation in violation of Title VII in her Amended Complaint, Plaintiff has abandoned that claim by not asserting it in response to Defendants' Motion for Summary Judgment.

4

charge because she believed that she was being "singled out for negative treatment" because of either her race or her sex. (Id.) Plaintiff states that Immke Northwest managers disciplined her more harshly than her co-workers, took away some of her sales (and the corresponding commissions) without reason, and interacted with her in an inappropriate manner. (Id.) On August 30, 2005, the Equal Employment Opportunity Commission issued a right to sue letter to Plaintiff. (Am. Compl. ¶ 20.) Plaintiff commenced this action on November 15, 2005. (Compl.)

## II.    Summary Judgment Standard

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984); see also Anderson, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

 The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Cos., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

## III.    Discrimination in Violation of Title VII and § 1981

Plaintiff alleges, in Count I of her Amended Complaint, that Defendants discriminated against her on the basis of her race in violation of 42 U.S.C. § 1981. In Count II, Plaintiff alleges that Defendants discriminated against her on the basis of her race and sex in violation of Title VII

7

of the Civil Rights Act of 1964.  Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 prohibits racial discrimination in the making and enforcing of private contracts.[6]

### A.    Claims Against IAG

As an initial matter, Defendants argue that relief cannot be granted against IAG as a matter of law because it never employed Plaintiff.  According to Defendants, IAG is an Ohio corporation that has never employed Plaintiff and that did not own or operate Immke Northwest or control any aspect of Immke Northwest.[7]  (Magill Aff. ¶ 3, Oct. 23, 2006.)  Defendants argue that because IAG does not own, operate, or control Immke Northwest, IAG is not Plaintiff's employer, and, therefore, it cannot be held liable for discrimination unlawful under either Title VII or § 1981.

---

[6] Specifically, the statute provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(a)-(b).

[7] In her Memorandum Contra, Plaintiff states that Immke Northwest, Inc. "is part of the Immke Auto. Group."  (Pl.'s Mem. Contra 1.)  Defendants explain that Immke <u>Auto</u> Group, Inc. is a separate entity from Immke <u>Automotive</u> Group, Inc. and that neither entity is related to Immke Northwest, Inc.  (Magill Aff. ¶ 3-4, Oct. 23, 2006.)  In his deposition, however, Lorton stated that Immke Northwest, Inc. and Immke Auto Group are "all owned by the same owners."  (Lorton Dep. 8:7-11.)  To add to the confusion further, in addition to being the name of an Ohio corporation, "Immke Auto Group" is apparently also a fictitious name registered to Immke Northwest, Inc. and Crestview Cadillac, Inc.  (<u>Id.</u> ¶ 5.)

Because the primary purpose of Title VII is remedial, its provisions are given a liberal construction.  E.g., Armbruster v. Quinn, 711 F.2d 1332, 1336 (6th Cir. 1983) (citing Tipler v. E.I. duPont de Nemours & Co., 443 F.2d 125, 131 (6th Cir. 1971)), abrogated on other grounds by Arbaugh v. Y & H Corp., 546 U.S. 500 (2006).  An "employer" is defined in Title VII as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person."  42 U.S.C. § 2000e(b).  "The term 'person' includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, [or] corporations . . . ."  Id. § 2000e(a) (emphasis added).  Direct employment relationships provide the usual basis for liability under Title VII.  However, interpreting the statute's definition of "employer," the Sixth Circuit has held that a parent corporation and its subsidiary can be found to be a single employer if the parent corporation "exercises a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity."  Armbruster, 711 F.2d at 1338.

This "single employer" theory is not limited to the situation where the plaintiff's direct employer is a subsidiary of another entity.  In Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993 (6th Cir. 1997) (citing York v. Tenn. Crushed Stone Ass'n, 684 F.2d 360 (6th Cir. 1982)), the court explained that the issue is "whether two entities are so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'"

> In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control.

Id. at 993-94 (citing York, 684 F.2d at 362); accord Armbruster, 711 F.2d at 1337.  The court in

Swallows applied these factors to determine whether a state university, lacking any ownership

interest of the plaintiff's direct employer, could be liable for alleged discrimination by the direct

employer.  Swallows, 128 F.3d at 994-96.

 In addition to the "single employer" theory, there are two other approaches by which a

defendant that does not directly employ a plaintiff may be considered an employer under Title VII.

Under the "joint employer" theory, a person is considered an employer if the person "has control

over another [person]'s employees sufficient to show that the two [persons] are acting as a 'joint

employer' of those employees."  Id. at 993 (citing Carrier Corp. v. NLRB, 768 F.2d 778 (6th Cir.

1985); Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico, 929 F.2d 814 (1st Cir. 1991)).

A person may also be considered an employer if the plaintiff's direct employer was acting as the

agent of that person.  Id. (citing Deal v. State Farm County Mut. Ins. Co. of Tex., 5 F.3d 117 (5th

Cir. 1993); Fike v. Gold Kist, Inc., 514 F. Supp. 722 (N.D. Ala. 1981), aff'd, 664 F.2d 295 (11th Cir.

1981)).

 The Swallows court analyzed the question of who may be considered an employer under the

Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act

("ADA").  The court's analysis, however, is equally applicable to the issue in the context of Title

VII.  Id. at 993 n.2 ("'Because Title VII, the ADEA, and the ADA define "employer" essentially the

same way,' [courts] rely on case law developed under all three statutes" when determining whether

a person can be liable as an employer for alleged discrimination. (quoting Wathen v. Gen. Elec. Co.,

115 F.3d 400, 404 n.6 (6th Cir. 1997))).  In addition, courts employ this same analysis when a

plaintiff seeks to hold a person, not the plaintiff's direct employer, liable under § 1981 for

discrimination in employment based upon race. E.g., Alie v. NYNEX Corp., 158 F.R.D. 239, 245 & n.3 (E.D.N.Y. 1994); Sargent v. McGrath, 685 F. Supp. 1087, 1089 (E.D. Wis. 1988) (applying the four-factor test from Armbruster to determine whether a parent corporation could be held liable under Title VII and § 1981).

In her Amended Complaint, Plaintiff alleges that "[f]or purposes of employment law, Immke Automotive Group, Inc. is also considered to be an employer of Mrs. Tiller." (Am. Compl. ¶ 6.) In her Memorandum Contra, Plaintiff does not respond in any way to the argument to the contrary made by Defendants in support of their Motion for Summary Judgment. Plaintiff has set forth no specific facts showing that she had a contract for employment with IAG.[8] She has also failed to present any theory under which IAG can be considered her employer. Instead, it appears Plaintiff has rested on the allegations made in the Amended Complaint. As Plaintiff has not met her burden of showing that a genuine issue of fact exists as to whether IAG can be considered her employer, Rule 56(e) dictates that the Court enter summary judgment against Plaintiff on Count I and Count II of her Amended Complaint to the extent that she alleges those causes of action against IAG.

## B.    Alleged Discrimination by Immke Northwest

In an employment discrimination case, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or, using the analytical framework

---

[8] To hold IAG liable under § 1981 for discriminating against her in enforcing a contract on the basis of her race, Plaintiff must show that she had a contract for employment with IAG. The contract need not be for employment for a certain period of time. At-will employees possess the requisite contractual relationship, under Ohio law, to maintain a § 1981 claim so long as they can establish the contractual foundations of offer, acceptance, and consideration. Williams v. United Dairy Farmers, 20 F. Supp. 2d 1193, 1202 (S.D. Ohio 1998) (Marbley, J.) (citing Mers v. Dispatch Printing Co., 19 Ohio St. 3d 100, 103 (1985)); accord Aquino v. Honda of Am., Inc., 158 F. App'x 667, 673 n.3 (6th Cir. 2005) (unpublished) ("§ 1981 does, in fact, apply to at-will employment relationships in Ohio.")

set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), by presenting circumstantial evidence from which a jury may infer a discriminatory motive underlying an adverse employment action.  <u>See</u> <u>Kline v. Tenn. Valley Auth.</u>, 128 F.3d 337, 348 (6th Cir. 1997).  Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  <u>Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.</u>, 176 F.3d 921, 926 (6th Cir. 1999).  In this case, Plaintiff does not present any direct evidence of discrimination.  Her claims are therefore analyzed under the framework set forth in <u>McDonnell Douglas</u>.

Under that framework, a plaintiff must first establish a prima facie case of discrimination. If the plaintiff does so, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>McDonnell Douglas</u>, 411 U.S. at 802-03.  If the employer articulates such a reason, the presumption of discrimination drops away, leaving only the issue of "discrimination *vel non*."  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43 (2000).  The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual.  <u>See</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).  The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against her.  <u>Id.</u>

### 1.    Prima Facie Case

Plaintiff may establish a prima facie case of discrimination by proving that: (1) she is a member of a protected class; (2) she was qualified for her job and performed it satisfactorily; (3) despite her qualifications and performance, she suffered an adverse employment action; and (4) she was either replaced by a person outside the protected class or was treated less favorably than a

similarly situated individual outside her protected class.[9]  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572-73 (6th Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802).

Defendants do not dispute that Plaintiff satisfies the first three elements of the prima facie case, but they do argue that Plaintiff has failed to establish the fourth element.  Plaintiff contends that she was replaced by a person outside her protected class because she was the only African-American woman employed by Immke Northwest as a sales representative at the time of her termination and Immke Northwest has not hired an African-American woman since then.  As such, Plaintiff argues that her "work must have been reassigned to individuals outside her protected class." (Pl.'s Mem. Contra 9.)  Defendants assert that Immke Northwest did not hire anyone to replace Plaintiff because, at the time of her termination, it had too many sales representatives for the available work.  (Lorton Aff. ¶ 33, Oct. 23, 2006.)  "Instead of hiring a new salesperson, the existing work was distributed among the remaining salespersons."  (Id.)

Plaintiff seems to present two similar yet separate arguments as to how she was replaced by someone outside of her protected class:  Because she was the only African-American woman employed by Immke Northwest as a sales representative and Immke Northwest has not hired an African-American woman since Plaintiff was terminated, her responsibilities were assigned to either (1) existing sales representatives outside her protected class or (2) later hired sales representatives outside her protected class.

_____

[9] "The elements of [a] prima facie case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981."  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 573 n.5 (6th Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)).  As the same analytical framework applies to both Plaintiff's Title VII claim and her § 1981 claim, the Court will analyze these two claims together.

These arguments lack merit for two reasons.  First, the inquiry as to whether Plaintiff was replaced by someone outside her protected class is not whether she was replaced by someone other than an African-American woman.  As Plaintiff alleges that Defendants discriminated against her both on the basis of her race and her sex, there are two separate inquiries.  To establish the fourth element of a prima facie case of discrimination based upon her race, Plaintiff may show that she was replaced by a person not African-American.  Likewise, for discrimination based upon her sex, Plaintiff may show that she was replaced by a person not female.

Second, and more importantly, a plaintiff cannot establish that she was replaced by someone outside of her protected class by merely showing that her responsibilities were reassigned to other employees outside her protected class.  "[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work."  Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) (citing Sahadi v. Reynolds Chem., 636 F.2d 1116, 1117 (6th Cir. 1980)).  Thus, to the extent that she argues that existing sales representatives assumed her duties, Plaintiff fails to establish the fourth element of the prima facie case.

In addition, Plaintiff has not shown that she was replaced by someone outside either of her protected classes subsequently hired by Immke Northwest.  "A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."  Id.  To establish a prima facie case based upon being replaced by someone outside of either of her protected classes, Plaintiff must set forth specific facts that would support a finding that another employee was hired or reassigned to perform her duties.  See Vaughn v. Watkins Motor Lines, Inc., 291 F.3d 900, 906-07 (6th Cir.

14

2002) (holding that the plaintiffs failed to establish a prima facie case where the record contained
no evidence concerning the employees who allegedly had replaced them).

Plaintiff has failed to meet this burden because there is no evidence on the record that shows
that Immke Northwest hired or reassigned an employee to perform Plaintiff's duties.  Although
Plaintiff states–and Defendants concede–that Immke Northwest has not hired any African-American
women since Plaintiff's termination, Plaintiff has presented no evidence that Immke Northwest has
hired <u>any</u> sales representatives since her termination.[10]  Furthermore, there is no evidence that
Immke Northwest replaced Plaintiff by selecting some other employee and reassigning Plaintiff's
duties to that particular employee.  Instead, it is undisputed that Plaintiff's work was simply
redistributed among existing employees–the other sales representatives–already performing related
work.  <u>Cf. Barnes</u>, 896 F.2d at 1465.

Although Plaintiff has not shown that she was replaced by a person outside either of her
protected classes, she may also establish the fourth element of her prima facie case by showing that
she was treated less favorably than similarly situated individuals outside either of her protected
classes.  <u>Johnson</u>, 215 F.3d at 572-73 (citing <u>McDonnell Douglas</u>, 411 U.S. at 802).  When
comparing her treatment to that of employees outside her protected classes, those employees and
Plaintiff "must be similar in 'all of the <u>relevant</u> aspects.' "  <u>Ercegovich v. Goodyear Tire & Rubber
Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998) (quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796,
802 (6th Cir. 1994)).  "[T]o be deemed 'similarly situated,' the individual with whom the plaintiff
seeks to compare his/her treatment must . . . have engaged in the same conduct without such

---

[10] In his deposition, Lorton testified that he has hired two African-American male sales
representatives during the time in which he has worked at Immke Northwest, but there is no
indication as to when these two men were hired.  (Lorton Dep. 22:12-21.)

differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (citing Lanear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988); Cox v. Elec. Data Sys. Corp., 751 F. Supp. 680 (E.D. Mich. 1990); Mazzella v. RCA Global Commc'ns, Inc., 642 F. Supp. 1531 (S.D.N.Y. 1986), aff'd, 814 F.2d 653 (2d Cir. 1987)). Put another way, the plaintiff must show that she received less favorable treatment than similarly situated employees outside of the plaintiff's protected class as a result of similar conduct. In the case where an employee alleges a discriminatory termination, the relevant conduct is that which precipitated the employer's decision to terminate the employee. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) ("In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action.")

As Immke Northwest terminated Plaintiff for poor sales performance, the individuals who are similarly situated in all relevant aspects are the other Immke Honda sales representatives who had sales performance similar to that of Plaintiff. Plaintiff has not produced any evidence to demonstrate how any of these sales representatives similarly situated in all relevant aspects was treated any more favorably than she was treated. Rather, the undisputed evidence shows that Immke Honda sales representatives outside of Plaintiff's protected classes with similar sales performance received the same treatment as Plaintiff. In addition to Plaintiff, Defendants state that Immke Northwest also terminated Freeman Beachy, a white male sales representative at Immke Honda, because of his poor sales during the months of July, August, and September 2004. (Lorton Aff. ¶¶ 18, 22, June 26, 2006.) Beachy, like Plaintiff, did not earn commissions sufficient to cover his draw

16

during the months of July and August 2004.  (Id. ¶ 19.)  Also like Plaintiff, Beachy did not meet the unit sales target for September 2004.  (Id. ¶ 20.)

Instead of comparing herself to other sales representatives with poor sales performance, Plaintiff sets forth evidence that shows that in the months preceding her termination she was treated less favorably than the other sales representatives at Immke Northwest.  In her affidavit, Plaintiff states that she received a written warning from a sales manager for failing to mark a vehicle as sold in Immke Northwest's inventory system.  (Pl.'s Aff. ¶ 7.)  The warning states that failure to improve would result in Plaintiff's termination.  (Employee Warning Report (July 22, 2004), Pl.'s Aff. Ex. 4.)  Plaintiff asserts that her co-workers were not threatened with termination after making a "minor mistake" such as this.  (Pl.'s Aff. ¶ 14.)  Next, Plaintiff points to a written warning that she received from Lorton for being one minute late to a meeting.  (Id. ¶ 10.)  According to Plaintiff, "[n]o one else at the dealership was written up for being a minute late to work or for any meeting.  In fact, employees were often very late, for example ten to fifteen minutes late, yet were not written up." (Id.)  Finally, Plaintiff states that during a confrontation regarding a customer survey, Lorton raised his voice and threw a paper at her when she was sitting at her desk.[11]  (Pl.'s Dep. 81:6-82:16.) Plaintiff avers that Lorton did not speak to other sales representatives rudely or throw paper at them. (Pl.'s Aff. ¶ 14.)

---

[11] In her affidavit, Plaintiff states that Lorton threw "several papers" at her.  (Pl.'s Aff. ¶ 11.)  The Court will not consider this statement because it contradicts Plaintiff's earlier deposition testimony.  In her deposition, Plaintiff consistently referred to "the paper" that was thrown at her and acknowledged that "[a] piece of paper" was thrown at her.  (Pl.'s Dep. 81:17, 82:10-13.)  "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."  Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986) (citing Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir.1984)).

This evidence is relevant to showing that Defendants' stated reason for terminating Plaintiff was a pretext for unlawful discrimination.  It is insufficient, however, to establish the fourth element of the prima facie case.  In order to satisfy the fourth element, the plaintiff must show that she was treated less favorably than similarly situated employees outside her protected class.  Because the inquiry focuses on the reason for the adverse employment action, the evidence of less favorable treatment must show that similarly situated employees, who engaged in the same or similar relevant conduct as the plaintiff, did not suffer the same adverse employment action as the plaintiff.  Plaintiff has presented no proof to this end.  There is simply no evidence that Immke Northwest treated Plaintiff differently than any other sales representatives outside either of her protected classes when it terminated her employment based upon her poor sales performance.  Accordingly, she cannot show that she was treated less favorably than similarly situated persons outside one or both of her protected classes, and she therefore cannot establish a prima facie case of unlawful discrimination.

Although Plaintiff has not advanced the claim in her Memorandum Contra, Plaintiff's Amended Complaint, liberally construed, could be interpreted to state a cause of action under Title VII based upon disparate treatment prior to her termination.  A cause of action based upon pre-termination disparate treatment by Immke Northwest fails as a matter of law, however, because none of the alleged discriminatory pre-termination conduct constitutes an actionable adverse employment action.  E.g., Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); White v. Burlington N. & Sante Fe Ry. Co., 364 F.3d 789, 797-98 (6th Cir. 2004) (same); Ford v. Gen. Motors Corp., 305 F.3d 545, 553 (6th Cir. 2002) (holding that to be actionable

under Title VII, and adverse employment action must be "materially adverse" to the plaintiff (citing Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999); Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996)).  Lorton's conduct and the disciplinary warnings received by Plaintiff were not significant changes in Plaintiff's employment and were therefore not materially adverse to her.

While Plaintiff's allegations of Immke Northwest's conduct prior to her termination are not sufficient to create a prima facie case of discrimination, they nevertheless will also be considered in connection with Plaintiff's claim that these events were factors in the decision to terminate her employment, as discussed infra.

### 2. Legitimate, Non-Discriminatory Reason for Termination and Pretext to Hide Unlawful Discrimination

Even if Plaintiff were able to satisfy her prima facie burden, her claims still fail because Defendants have produced a legitimate non-discriminatory reason for terminating Plaintiff's employment, and Plaintiff cannot prove that the reason offered was pretextual.  Defendants contend that Plaintiff was terminated because her failure to generate sales under the new commission structure during the months of July, August, and September 2004 demonstrated a lack of competence in sales.  The Court finds that Defendants have met their burden of articulating a legitimate, non-discriminatory reason for discharging Plaintiff.  Therefore, as discussed above, the presumption of discrimination drops away and the burden shifts back to Plaintiff to prove, by a preponderance of the evidence, that the stated reason for her termination was pretextual.

Plaintiff may establish pretext by showing that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the discharge, or (3) the proffered reason was insufficient to motivate the discharge.  See Peters v. Lincoln Elec. Co., 285 F.3d 456, 471-72 (6th

Cir. 2002); Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003) (citing Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001)) (alteration in original).

To establish that the proffered reason had no basis in fact, the plaintiff must show that "the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" Manzer, 29 F.3d at 1084 (citing Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123-24 (7th Cir. 1994)).  Plaintiff has not produced sufficient evidence for a jury to find that Immke Northwest's basis for terminating Plaintiff was factually false.  Plaintiff did not earn commissions sufficient to cover her draw during the months of July and August.  (Lorton Aff. ¶ 22, Oct. 23, 2006.)  In addition, Lorton testified that in September Plaintiff failed to reach her unit sales target of twelve cars, which Plaintiff needed to reach before receiving a bonus.  (Id. ¶ 23.)  Plaintiff argues that her sales were acceptable during these months, however, she does not dispute the facts upon which Immke Northwest based its conclusion that Plaintiff lacked competence in sales.  She has produced no evidence showing that she actually covered her draw during the months of July and August, and she admits that she sold less than the target of twelve vehicles in all three months.

In support of her predication that her sales were acceptable, Plaintiff states that she reached her target and received a bonus in September.  (Pl.'s Aff. ¶ 16.)  Although Plaintiff says that she reached the sales target in September, by her own account Plaintiff only sold nine vehicles that month and Plaintiff has not disputed that her sales target was twelve.  Given this, it is difficult to

20

comprehend how Plaintiff contends that she reached her target, and Plaintiff has offered no explanation. Defendants do not dispute that Plaintiff received a bonus for her September sales, but they state that, based upon her September sales, she should not have received it because she did not reach her target of twelve vehicles. (Lorton Aff. ¶ 30, Oct. 23, 2006.) Whether Plaintiff received a bonus on her September sales is irrelevant, however, because Immke Northwest did not consider whether Plaintiff received a bonus in September when it determined that Plaintiff's sales were insufficient. (Id. ¶ 24.) In evaluating Plaintiff's sales performance for September, Lorton states that he only considered Plaintiff's unit sales for that month. (Id.) According to Defendants, Plaintiff's bonus for September sales was not calculated until after Plaintiff was terminated. (See id.) Plaintiff has presented no evidence to the contrary.

The Court thus determines that the first potential method of challenging Defendants' proffered reason is not available to Plaintiff because there is no genuine issue of material fact related to the probity of the factual basis for the proffered reason.

Plaintiff also contends that the proffered reason was insufficient to motivate her discharge, but, based on her argument, it seems that Plaintiff is actually asserting that the proffered reason did not actually motivate Immke Northwest to terminate her employment. Irrespective of which method Plaintiff is using, she is unable to set forth facts that would permit a conclusion that Immke Northwest's proffered reason was a pretext for unlawful discrimination.

To establish that the proffered reason was insufficient to motivate the discharge, the plaintiff must prove that even if the proffered reason for plaintiff's discharge did happen, it was not so egregious as to warrant termination. This is usually established by evidence that other employees

who are similarly situated and engaged in the same type of behavior were not subject to the same adverse employment action as the plaintiff.  Manzer, 29 F.3d at 1084.

Plaintiff argues that her sales performance was not sufficiently deficient to warrant her termination.  She states that her July and August results were only below the unit sales target by "a vehicle or two."[12]  She asserts that two units were improperly reassigned from her to other sales representatives,[13] and, without these reassignments, she "probably would have met her target in one of those two months."  Plaintiff also contends that she was absent more than usual during the months of July, August, and September and that her absences hindered her sales performance.

Regardless of how close Plaintiff was to her unit sales target or whether units were improperly reassigned from her, Plaintiff cannot establish that her sales performance was insufficient to motivate Immke Northwest to terminate her employment.  She has presented no evidence that sales performance below established parameters was not a sufficient reason for Immke Northwest to terminate a sales representative.  Defendants, however, have presented evidence that the proffered reason was sufficient to warrant termination.  As discussed supra, Immke Northwest terminated another non-minority sales representative for sales performance nearly identical to that of Plaintiff. From this undisputed fact, it seems readily apparent that poor sales performance is a sufficient reason for Immke Northwest to terminate a sales representative.

---

[12] By Plaintiff's own admission, her July and August sales were below target by more than just "a vehicle or two."  As Plaintiff sold ten vehicles in July and eight in August, her unit sales were two vehicles below target in July and four vehicles below target in August.

[13] Plaintiff states that in July sales from customers named Andrew Detrick and Tom Green were reassigned from her to other sales representatives.  (Pl.'s Aff. ¶ 13.)  According to Plaintiff, the sales were reassigned without explanation.  (Id.)  Defendants argue that neither reassignment was improper because the customers were reassigned consistent with Immke Honda policy.  (Lorton Aff. ¶¶ 51-54, Oct. 23, 2006.)

The crux of Plaintiff's argument is that although her sales were below her target, her lack of sales did not merit termination given the reassigned sales, her absences, and the arguably small margin by which she failed to meet her target.  Although this argument could prove availing if supported by facts, Plaintiff has presented no evidence to show that any sales representative with similar sales, reassigned sales, and absences was not terminated for poor performance.  Cf. McClain v. Nw. Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 334 (6th Cir. 2006) (Plaintiff, an African-American female, demonstrated that a jury could find the proffered reason for her discharge pretextual by presenting evidence that a similarly situated white male with similar problems and instances of more severe misconduct was not terminated.)  With only the uncontroverted evidence that at least one other non-minority Immke Honda sales representative was discharged for deficient sales, Plaintiff cannot show that her poor sales performance was not a sufficient reason for her termination.

To establish that the proffered reason did not actually motivate the discharge, a plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal," but "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant.  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  Manzer, 29 F.3d at 1084.

As her primary evidence that her poor sales performance did not actually motivate Immke Northwest to terminate her, Plaintiff contends that Immke Northwest did not act reasonably in evaluating her sales performance.   In doing so, Plaintiff attacks Immke Northwest's judgment in

deciding to terminate her.  In <u>Wexler v. White's Furniture, Inc.</u>, 317 F.3d 564, 576 (6th Cir. 2003) (en banc) (citing <u>EEOC v. Yenkin-Majestic Paint Corp.</u>, 112 F.3d 831, 835 (6th Cir. 1997)), the court rejected the notion that an employer's business judgment regarding an employee's performance is "an absolute defense to unlawful discrimination."  Rather, to show pretext, "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  <u>Id.</u> (citing <u>Smith v. Chrysler Corp.</u>, 155 F.3d 799, 807 (6th Cir. 1998)); <u>see also</u> <u>Burdine</u>, 450 U.S. at 259.  When an employee is terminated for poor performance, evidence that shows that the employer misjudged the employee's performance is probative of whether the proffered reason is a pretext for discrimination.  <u>See</u> <u>Wexler</u>, 317 F.3d at 577 (quoting <u>Burdine</u>, 450 U.S. at 259).

According to Plaintiff, Immke Northwest's failure to consider her sales performance prior to July 2004 strongly indicates that Immke Northwest's proffered reason for terminating Plaintiff is pretextual.  She states that she earned substantial commissions in 2002 and 2003[14] and that a reasonable employer would have considered her sales performance over a longer period of time, not just during the most recent three months.  Defendants respond that evaluating Plaintiff's performance over a three-month period was reasonable because it was consistent with Lorton's objectives for his staff of sales representatives.  Lorton states that upon starting as the Senior Sales Manager at Immke Honda, he noticed that the sales staff, as a whole, was not earning sufficiently

---

[14] Plaintiff earned $59,839.37 in 2002 and $60,188.86 in 2003.  (Pl.'s Aff. ¶ 3; W-2 Wage and Tax Statement (2002), Pl.'s Aff. Ex. 2; W-2 Wage and Tax Statement (2003), Pl.'s Aff. Ex. 3.)  In his deposition, Lorton acknowledged that Plaintiff's 2002 and 2003 earnings represented reasonable compensation for a commissioned automobile sales representative.  (Lorton Dep. 30:21-23.)

high commissions and that there were several sales representatives underperforming. (Lorton Aff. ¶¶ 3-4, June 26, 2006.) He altered the commission structure to improve the staff's performance, and he believed that ninety days was a sufficient time to assess the sales representatives' performance under the new commission structure. (Id. ¶¶ 5-10.) Lorton explains that he did not review sales representatives' individual performances for prior years because he wanted to evaluate their performance under his management and the new commission structure. (Lorton Aff. ¶ 12, Oct. 23, 2006.) Given Lorton's desire to improve the selling performance of his staff of sales representatives, the Court cannot find that Lorton and Eggleston acted unreasonably by only considering Plaintiff's sales during July, August, and September 2004 when evaluating her sales performance.[15]

Plaintiff also argues that Immke Northwest acted unreasonably in evaluating her sales performance because it did not consider her absences from work during July, August, and September 2004. The parties appear to agree that Plaintiff was entitled to two weeks of vacation time in 2004. (See Magill Aff. ¶ 20, Oct. 23, 2006; Pl.'s Dep. 175:17-24.) Plaintiff states, in her affidavit, that she missed an unspecified number of days of work because of her daughter's high school graduation party, taking her daughter to Miami University, "a couple sick days," and a closing on a house. (Pl.'s Aff. ¶ 17.) In her earlier deposition, Plaintiff testified that she took a week of vacation time in July 2004 and no vacation time in September 2004. (Pl.'s Dep. 177:7-9, 13-16.) She could not recall whether she had taken any vacation time in August 2004 (id. at 177:10-12), and she did not remember whether she had taken sick leave at any time during 2004. (Id. at 179:6-8.) Plaintiff also

_____

[15] Moreover, even if they had considered Plaintiff's earlier sales performance, their decision to terminate her employment would not have been unreasonable necessarily. Plaintiff's income history reveals that, although she earned significant commissions in 2002 and 2003, her earnings decreased dramatically in 2004. (W-2 Wage and Tax Statement (2004), Defs.' Reply Mem. Ex. B; Magill Aff. ¶¶ 15-16, Oct. 23, 2006.)

testified that she requested time off for her daughter's graduation and her house closing, but she did not indicate how many days off she requested for either occasion. (Id. at 183.) She stated that she did not request any vacation pay for her time off for her house closing, but she could not recall whether she had requested vacation pay for her daughter's graduation. (Id. at 183:19-184:2.)

Defendants' account of Plaintiff's absences from work differs in many respects. Defendants state that Plaintiff's personnel record reflects that she did not take any time off for vacation or illness in July, August, or September 2004. (Magill Aff. ¶¶ 20-21, Oct. 23, 2006.) Defendants assert that Plaintiff took her two weeks of vacation in April and June of that year. (Id. ¶ 20.) The personnel record also shows, according to Defendants, that Plaintiff only requested one day off for personal reasons during these months; Plaintiff requested August 20, 2004 off to move her daughter to college. (Id. ¶ 22.) Additionally, Defendant has produced two handwritten memoranda, both by Plaintiff and dated July 23, 2004, requesting time off from work. One requests that Plaintiff be allowed to leave work early on July 26, 2004 to go to the closing on her house, and the other informs that Plaintiff will be late arriving to work on August 2, 2004 because of a court hearing. (Resps. Doc. Reqs., Defs.' Reply Mem. Ex. G.)

The evidence presented does not clearly indicate how many days Plaintiff was off from work during the three months; but, as the parties dispute this fact, for summary judgment purposes the Court must accept Plaintiff's account of her absences and the reasonable inferences that can be drawn from her account. Even when viewing the facts in Plaintiff's favor, however, Plaintiff has not set forth facts sufficient to find that Immke Northwest made an unreasonable business decision by not considering her absences when evaluating her performance.

First, in addition to providing only vague statements as to how much work she actually missed, Plaintiff has set forth no facts showing that the amount of work that she missed was more "than was normal."  Plaintiff has made no comparison of the number of absences during July, August, and September 2004 to any other three-month period of her employment with Immke Northwest.  In addition, Plaintiff has not produced any evidence that she was absent from work any more than any of the other sales representatives not terminated for insufficient sales during the same three months.

Second, assuming Plaintiff did miss more work than normal during this time period, she has not shown that a decision made without considering her absences is so unreasonable so as to allow a conclusion that Plaintiff's sales performance was not the actual motivation for her discharge. Lorton states that he did not consider any of Plaintiff's absences when evaluating her performance because he did not believe that her absences were excessive, and, in his experience, when sales representatives take time off they normally compensate by working harder or longer hours.  (Lorton Aff. ¶ 29, Oct. 23, 2006.)  Eggleston, no longer employed by Immke Northwest, stated that he never considered the number of days that a sales representative was present when evaluating sales performance.  (Eggleston Dep. 27:20-24.)   In his experience, when sales representatives take vacation, their monthly production does not drop because they make up for the absence during the weeks in which they are present.  (Id. at 27:15-19.)  Although possibly not the most accurate method of measuring sales performance, Lorton and Eggleston's practice of not considering absences does not display the type of judgment "so ridden with error that [the] defendant could not honestly have relied upon it."  Wexler, 317 F.3d at 576 (quoting In re Lewis, 845 F.2d 624, 633 (6th Cir. 1988)).

Next, Plaintiff argues that Immke Northwest's conduct prior to her termination suggests that it acted with a discriminatory motive in deciding to discharge her.  She points to four separate actions of Immke Northwest in support of this argument: (1) the written warning for failing to mark a vehicle as sold in the inventory system, (2) the two sales that were reassigned from Plaintiff to other sales representatives, (3) the written warning for being one minute late, and (4) Lorton throwing paper at Plaintiff and raising his voice at her.  These arguments in support of her assertions of pretext, however, do not permit an ultimate finding of discrimination.

Plaintiff argues that the written warning for the inventory mistake shows discriminatory intent because she received the warning despite not actually having made a mistake.  She also contends that the warning was discriminatory because it indicated that failure to improve would result in her dismissal, an action which Plaintiff alleges violated Immke Northwest's progressive discipline policy.  Sales Manager Ron Rarey signed this written warning.  (Lorton Aff. ¶ 38, Oct. 23, 2006; Pl.'s Dep. 93:21-95-11; Employee Warning Report (July 22, 2004), Pl.'s Aff. Ex. 4.) Rarey disciplined Plaintiff because he believed that she had sold a black Honda Pilot sport utility vehicle without marking it as sold in the dealership's inventory system.  (Pl.'s Dep. 98:24-99:14; Employee Warning Report (July 22, 2004), Pl.'s Aff. Ex. 4.)  According to Plaintiff, Rarey first verbally confronted Plaintiff concerning the problem but later apologized to Plaintiff after he realized that she had not made any mistake in managing the inventory.  (Pl.'s Dep. 97:25-98:23.) Plaintiff states that a written warning memorializing this altercation was placed in her personnel file without her being presented a copy, and it was not removed after Rarey apologized.  (Pl.'s Aff. ¶ 9.)

Neither the written warning for the inventory mistake nor the two sales that were reassigned from Plaintiff can support a finding of discriminatory animus because neither action was taken by Lorton or Eggleston.  Actions by individuals with no authority over the challenged employment action are not indicative of discriminatory intent of the employer.  Johnson, 319 F.3d at 868 (citing Ercegovich, 154 F.3d at 354-55).  It is undisputed that Lorton and Eggleston were the only Immke Honda managers responsible for terminating Plaintiff's employment.  Thus, to the extent that the written warning for the inventory mistake shows any racial or sexual discriminatory animus by Rarey, it does not show any discriminatory animus by Lorton or Eggleston.  For the same reason, regardless of the propriety of the reassignments, neither is probative of discriminatory animus by Lorton or Eggleston.  Like the written warning for the inventory mistake, Plaintiff has not shown that either Lorton or Eggleston was involved in making the decision to reassign these sales. Lorton has testified that he was not involved with either reassignment.  (Lorton Aff. ¶ 53, Oct. 23, 2006.)  According to Defendants, Rarey was responsible for one reassignment,[16] and sales manager Parag Patel reassigned the other sale.  (Id.)

Because neither Lorton nor Eggleston was involved in either the written warning for the inventory mistake or the two reassigned sales, these incidents are not directly probative of whether Immke Northwest's proffered reason is a pretext for discrimination.  Of course, discriminatory actions of an employee's supervisor can be imputed upon the decision-maker when the supervisor has the ability to influence the decision-maker.  Noble v. Brinker Int'l, Inc., 391 F.3d 715, 725 (6th Cir. 2004).  There is no evidence, however, that either Rarey or Patel had any authority to terminate

---

[16] An email received by Plaintiff from Rarey confirms that Rarey reassigned one customer, Andrew Detrick, from Plaintiff to another sales representative.  (Email from Ron Rarey to Tonya Tiller (July 9, 2004), Pl.'s Aff. Ex. 6.)

Plaintiff.  Nor is there any indication that either of these two sales managers influenced Lorton or Eggleston in deciding to discharge Plaintiff.  Cf. Johnson, 319 F.3d at 868 (finding that a jury could reasonably conclude that the plaintiff's former store manager, who displayed discriminatory animus toward African-Americans, played a significant role in another manager's decision to discharge plaintiff).

Unlike the two incidents just discussed, the written warning for being late and Lorton throwing paper at Plaintiff and raising his voice to her are directly attributable to one of the Immke Northwest managers who decided to discharge Plaintiff.  Nevertheless, these incidents do not allow a finding that it is more likely than not that Plaintiff was terminated for unlawful reasons rather than her poor sales performance.

Plaintiff states that Lorton discriminated against her by issuing to her a written warning for being one minute late to a meeting, even though other sales representatives were often late to meetings and did not receive written warnings.  Lorton testified that he issued the warning because Plaintiff had complained about his failure to reprimand other sales representatives for being late. (Lorton Aff. ¶ 27, June 26, 2006.)  Plaintiff told Lorton to issue her a written warning the next time that she was late.  (Id.; Lorton Dep. 47:8-19.)  The next time that she was late, Lorton issued her a written warning.  (Lorton Aff. ¶ 28.)  Admittedly, Lorton did not issue written warnings to other sales representatives (Lorton Dep. 47:24-48:1.); however, Plaintiff has not disputed that Lorton only issued the warning because of her insistence.  In any event, this incident does not indicate any discriminatory animus by Lorton.

The exchange between Lorton and Plaintiff regarding the customer survey is the final incident that Plaintiff points to as displaying Lorton's discriminatory animus.  On August 24, 2004,

Lorton approached Plaintiff's desk, where she was sitting, to inform her of a customer survey that indicated that Plaintiff had failed to timely act on a problem raised by the customer.  (Lorton Aff. ¶¶ 32, 34, June 26, 2006; Pl.'s Aff. ¶ 11.)  Defendants state that Lorton dropped the survey on Plaintiff's desk and told her to contact the customer to handle the matter.  (Lorton Aff. ¶ 35, June 26, 2006.)  According to Defendants, Plaintiff became "irate" and raised her voice when, in response to Plaintiff telling him that sales manager Rich Traxler was handling the situation, Lorton told Plaintiff to handle it.  (Id. ¶ 35-36.)  Plaintiff disputes some of the details of this encounter.  She states that Lorton threw the paper at her instead of dropping it on her desk.  (Pl.'s Dep. 82:10-11.) She also states that she remained calm, and it was Lorton who raised his voice and yelled at Plaintiff. (Id. at 83:4-8.)

Defendants argue that, even accepting Plaintiff's version of the events, this altercation between Lorton and Plaintiff does not tend to prove that discrimination based on race or sex is the more likely explanation for Immke Northwest terminating Plaintiff's employment.  This Court agrees.  The most this incident reveals, viewing the evidence in the light most favorable to Plaintiff, is that she and Lorton did not have an amicable working relationship.

Finally, Plaintiff argues that Immke Northwest's discriminatory animus is demonstrated by the facts that she was the only African-American, female sales representative during her three and one half years of employment and Immke Northwest has not hired an African-American, female sales representative since Plaintiff was terminated.  Plaintiff essentially contends that Immke Northwest's history of hiring is evidence that it discriminates against African-Americans and females.

31

A plaintiff may use statistical evidence of an employer's hiring history to prove that the defendant's proffered reason for the adverse employment action is merely a pretext for discrimination. E.g., Ballor v. Alcona County Road Comm'n, No. 95-CV-10366-BC, 1997 U.S. Dist. LEXIS 4337, at *18 (E.D. Mich. Mar. 20, 1997). In this case, Plaintiff attempts to prove pretext by demonstrating that Immke Northwest has statistically hired very few African-American women.[17] Defendants do not dispute Plaintiff's statements about the number of African-American women that it has hired. This evidence, however, does not show that Immke Northwest has discriminated in its hiring practices. "The fact that a certain percentage of individuals is or is not represented in the workplace is not necessarily dispositive and may, in fact, mean nothing at all." Ballor, 1997 U.S. Dist. LEXIS 4337, at *18-*19 (citing Furnco Const. Corp. v. Waters, 438 U.S. 567, 579 (1978)).

"In the Sixth Circuit, it is required that in order to indicate pretext 'the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.'" Ballor, 1997 U.S. Dist. LEXIS 4337, at *21 (quoting Barnes, 896 F.2d at 1466). The primary problem with Plaintiff's offer of statistical evidence is that she does not show a disparity between Immke Northwest's workforce and any statistically relevant group. A small percentage of African-Americans and women working at Immke Honda could be relevant to show discriminatory intent if that number were compared to percentages in a larger group such as applicants for the sales representative position or, even more broadly, qualified potential sales representatives within the

---

[17] Again, Plaintiff's argument improperly conflates the inquiry by directing the Court to Immke Northwest's history of hiring African-American women. Statistical evidence that Immke Northwest hires very few African-Americans would be probative of discriminatory animus based on race. Statistical evidence of the company hiring very few women would be probative of discriminatory animus based on sex.

community.   If a comparison like this uncovered a marked disparity and explained how the results could not likely be caused by nondiscriminatory practices, then the statistical evidence would be probative as to discriminatory intent.  Plaintiff has presented no relevant statistical comparison, and her argument that Immke Northwest's hiring history is indicative of its discriminatory animus is therefore unavailing.  See Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., 690 F.2d 88, 94 (6th Cir. 1982) (finding the plaintiff's statistical evidence inadequate, in part, because there were "no statistics as to the number of applicants for the available positions . . . and no figures showing how many of those applicants were white and how many were black").

In summary, with the evidence viewed in the light most favorable to Plaintiff, she cannot show that Defendants' proffered reason for terminating her employment was a pretext for illegal discrimination.  The undisputed facts in this case show that Plaintiff and a white male sales representative were both terminated for similar poor sales performance.  At most, Plaintiff has shown that she and her supervisor did not have an amicable working relationship and that her sales performance was not analyzed as comprehensively or deferentially as she perhaps would have preferred.  Plaintiff has not presented evidence that would allow a jury to conclude that Defendants' proffered reason is a pretext for unlawful discrimination.

## IV.    Claims Arising under the Law of Ohio

Having disposed of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims arising under the law of Ohio found in Counts III and IV of her Amended Complaint.  "It is well settled that a District Court may decline to exercise supplemental jurisdiction over state claims once it has dismissed all claims over which it possessed original jurisdiction."  Hall v. Hebrank, 102 F. Supp. 2d 844, 865 (S.D.Ohio 1999) (Rice, C.J.) (citing

Saglioccolo v. Eagle Ins. Co., 112 F.3d 226, 233 (6th Cir.1997)); accord 28 U.S.C. § 1367(c);

Musson Theatrical, Inc. v. Federal Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996).  Indeed,

the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state

claims generally should be dismissed.  Musson Theatrical, 89 F.3d at 1254-55.

**V.     Conclusion**

WHEREUPON, for the reasons set forth above, the Court hereby **GRANTS** Defendants'

Motion for Summary Judgment (R. at 15) as to Counts I and II of the Amended Complaint.  Counts

III and IV of the Amended Complaint are hereby **DISMISSED WITHOUT PREJUDICE**.  The

Clerk is **DIRECTED** to enter judgment in favor of Defendants on Counts I and II of the Amended

Complaint.


**IT IS SO ORDERED.**


April 27, 2007                                          **/s/ John D. Holschuh**
Date                                                            John D. Holschuh, Judge
                                                                  United States District Court